IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MISTY HENDERSON-HAYES, | ) | CASE NO. 5:08 CV 2056 |
| | ) | |
| Plaintiff, | ) | JUDGE GWIN |
| | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| MICHAEL J.ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Misty Henderson-Hayes' application for Disability Insurance benefits, Childhood Disability benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act, **42 U.S.C. §§416**, 423 and 1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends that the decision of the Commissioner be AFFIRMED.

I. **PROCEDURAL HISTORY**

On November 6, 2003, Plaintiff filed an application for Disability Insurance benefits, Child Disability Benefits, and Supplemental Security Income benefits, alleging that she had been disabled since birth because of a learning disability and a bad knee (Tr. 67-70, 176-79).  The

SSA denied Plaintiff's claims initially and upon reconsideration (Tr. 38-39, 181, 187, 197). Plaintiff requested a hearing, and on November 16, 2006 Administrative Law Judge Rita Eppler (the "ALJ") held a hearing on Plaintiff's claims.  On March 21, 2007, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of medium work involving no more than simple, repetitive tasks and that, therefore, Plaintiff was not disabled (Tr. 10, 24). On appeal, Plaintiff claims that the ALJ's decision that Plaintiff's condition does not meet or equal the requirements of Listing § 12.05(C) is not supported by substantial evidence.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on December 17, 1982 (age 23 at the time of the hearing and 24 at the time of the ALJ's determination), Plaintiff is a "younger individual."  See **20 C.F.R. §§404.1563**, 416. 963. Plaintiff last completed the 12th grade, attending special classes throughout her education (Tr. 323).  She also completed business technology training in June 2001 (Tr. 89).  From June 2001 until at least November 2003, Plaintiff worked part time as a clerk at discount or department stores (Tr. 93).

### B.  Medical Evidence

#### 1.  Mental Impairments

During a school IQ assessment in March 2000, Plaintiff's full scale IQ score was 71 (Tr. 148).  Her score placed her in the "borderline below average range of intelligence" (Tr. 148). Further testing revealed that Plaintiff had deficits in communication, daily living skills, and socialization (Tr. 151-52).  During a school Career Assessment administered in November 2000,

Plaintiff was 98% accurate in entering prices into a cash register (Tr. 131-38). It was noted, however, "that a calculator was provided for the numerical portions of the assessment and scores may be inflated due to this fact" (Tr. 137). An Individualized Education Program form completed in April 2001, as part of Plaintiff's transition out of school indicated that Plaintiff needed to "improve and develop work related behaviors, personal skills leading to employment, independent living and community participation (Tr. 157).

In October 2003, Plaintiff completed an agency "Disability Report Adult" form, which consisted of ten pages of questions about her claim for disability (Tr. 82-91). In March 2004, Plaintiff completed a seven-page "Disability Report–Appeal" form (tr. 107-113), and in November 2004, she completed a four-page "Symptoms Report" form (tr. 121-24).

In December 2003, state agency psychologist Jason Haakins, Psy.D., completed a Psychiatric Review Technique form and a Mental RFC Assessment for Plaintiff (Tr. 222-37). He assessed that Plaintiff had borderline intellectual functioning and concluded that, in most areas, Plaintiff was not significantly but moderately limited in understanding and remembering very short and simple instructions, carrying out such instructions, and working in coordination with or near others without being distracted. He further determined that Plaintiff was markedly limited in understanding and remembering detailed instructions and in carrying out such instructions (Tr. 235). Dr. Haakins concluded that Plaintiff retained the ability for "simple, repetitive tasks with limited contact with the general public" (Tr. 237).

In April 2004, state agency physician Paul Scheatzle, D.O., while conducting a physical exam of Plaintiff, noted that Plaintiff "appear[ed] to have some mild impairments with regards to cognitive function. It took her a great deal of time to complete her initial consultation form and

3

she [was] somewhat of a poor historian" (Tr. 251).  He added, however, that Plaintiff "was able to follow multi-step commands and gave good effort" and that "her understanding and memory appear[ed] to be within normal limits" (Tr. 251-52).

In April 2004, state agency psychologist Laurel Smith, Psy.D., conducted a mental status examination of Plaintiff (Tr. 245-49).  Dr. Smith assessed Plaintiff's Full Scale IQ at 70, which, Dr. Smith noted, placed Plaintiff within the mild mental retardation range (Tr. 247).  Dr. Smith further determined that Plaintiff's Verbal Scale was 76 and that her Performance IQ was 69 (Id.).  Dr. Smith also noted that Plaintiff showed "significant impairment in the areas of communication, social-interpersonal skills, use of community resources, self-direction, [and] functional academic skills" (Tr. 248).  She opined, however, that Plaintiff's IQ scores were "considered low as a measure of best current functioning because of interference from nonintellective factors," noting that Plaintiff was "often flippant, immature, arrogant, argumentative, and sullen" (Tr. 246-47).  In addition, Dr. Smith assessed Plaintiff's global assessment of functioning at 45 and opined that "[w]ith regard to her work situation, [she] should be considered 'psychologically disabled' and would benefit from someone helping with her finances and medical treatments" (Tr. 246).  Additionally, Plaintiff represented during the exam that she used to "sit there and drink a 12-pack whatever was there," and that when she was in high school she "was into weed" (Id.).

In December 2005, state agency psychologist John Comley, Psy.D. conducted a mental status exam of Plaintiff and noted that "[m]uch of the time during the period the patient cooperated well and was alert and attentive, but she also frequently appeared self-conscious, passive, dependent, withdrawn, apathetic, subdued, and blunted in her affect" (Tr. 308-314).  Dr.

Comley assessed Plaintiff's Full Scale IQ at 70 (Tr. 310).  Plaintiff's Verbal Scale IQ was 76 and her Performance IQ was 69 (Id.).  Additionally, Dr. Comley assessed Plaintiff's global assessment of functioning at 49 and opined that "[w]ith regard to her work situation, [she] should be considered psychologically disabled" (Tr. 311).  Dr. Comley also completed a mental RFC assessment for Plaintiff and in twenty different areas of functioning he assessed that she was not significantly limited in one area; moderately limited in seven areas; markedly limited in four areas; and extremely limited in eight areas, including the ability to complete a work day or week without interruptions, to get along with co-workers, and to maintain socially appropriate behavior (Tr. 313).

In a Background Questionnaire from July 2006, Plaintiff responded that she was able to shop for groceries (Tr. 172).

## 2. Physical Impairments

On April 15, 2002, Edward A. Connolly, M.D. conducted an orthopedic evaluation at the request of the Bureau of Vocational Rehabilitation (Tr. 211).  Plaintiff complained of left knee pain and instability and was wearing a knee brace (Id.).  On physical examination, Plaintiff was tender diffusely over the anterior aspect of the left knee, and Dr. Connolly diagnosed bilateral knee pain and left patella subluxation, recurrent (Id.).

Plaintiff was seen by F. M. Terry, M.D. on February 24, 2004 at the request of the Department of Job and Family Services (Tr. 239).  Dr. Terry completed a basic medical form noting Plaintiff's left knee impairments and history of asthma.  Physical examination revealed some abnormalities including tenderness, decreased range of motion and walking with the left leg in a ten degree flexed position (Tr. 239).  Dr. Terry opined that Plaintiff would be limited to

lifting and carrying 21-25 pounds occasionally and 11-20 pounds frequently. He further noted that Plaintiff would be limited in her ability to push and pull from a standing position, and she would be limited in her ability to bend or perform repetitive foot movements (Tr. 240). X-rays of the left knee at that time revealed loose bodies within the joint (Tr. 241).

As noted above, Dr. Scheatzle conducted a physical examination of Plaintiff in April 2004 at the request of the Social Security Administration (Tr. 251-56). Physical examination revealed mild gait abnormalities, slightly decreased stance on the left lower extremity, and some joint instability and decreased range of motion of the left knee (Tr. 251, 256). Dr. Sheatzle concluded that Plaintiff exhibited intermittent knee pain and instability and probable osteochondral fracture with loose bodies within the left knee joint (Tr. 251). Dr. Sheatzle opined that Plaintiff's ability to sit, stand and walk were unlimited, but that based on her intermittent symptomology, Plaintiff may need a break for several minutes after walking a city block (Tr. 252). He further opined that Plaintiff was able to lift at a medium level of 50 pounds occasionally and 20 pounds more frequently, and that Plaintiff should not do repetitive work in a kneeling type position (Tr. 252).

On June 28, 2005, Plaintiff underwent a physical evaluation conducted by William J. Skelly, M.D. related to Plaintiff's complaints of bilateral knee pain and instability (Tr. 264-66). Dr. Skelly found it difficult to examine Plaintiff due to her guarding of both knees (Tr. 264). He opined that Plaintiff's symptoms were related to the patellofemoral joint on the left and right and recommended physical therapy and bracing (Tr. 264-65).

### C. Hearing Testimony

Plaintiff testified that she attended a friend's wedding the year before the hearing, and that every month she visited her mom, who lived about thirty to forty-five minutes away from her (Tr. 326). Plaintiff explained that she no longer has a bank account — although she used to have one — because she had trouble keeping it balanced and would sometimes bounce checks (Tr. 328). In addition, Plaintiff testified that she did not do her own grocery shopping because she was unsure how to calculate totals and afraid that she would spend more money than she had (Tr. 333). She also stated that she had problems socializing because she did not "like being around a lot of people," although everyday she would visit friends in the neighborhood (Tr. 334). Plaintiff further testified that she watched television with her husband and played board and card games with him (Tr. 340). In 2003, Plaintiff lived in her aunt and uncle's house with five other people and stated that it "went pretty good" (Tr. 341). When asked whether she ever smoked marijuana, Plaintiff initially answered "no," but when the ALJ and Plaintiff's attorney stressed the importance of answering honestly, Plaintiff responded that "[w]hen [she] was in high school [she] experimented with it" (Tr. 342-43).

### III. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance benefits, Childhood Disability benefits, and Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* **42 U.S.C. §§216(i)**, 223, and 1614(a)(3)(A). A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." See **20 C.F.R. §§404.1505(a)** and 416.905.

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  See *Cunningham v. Apfel*, **12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001)**; *Garner v. Heckler*, **745 F.2d 383, 387 (6th Cir. 1984)**; *Richardson v. Perales*, **402 U.S. 389, 401 (1971)**. "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  See *Kirk v. Secretary of Health & Human Servs.*, **667 F.2d 524, 535 (6th Cir. 1981)**.  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. See *Mullen v. Bowen*, **800 F.2d 535, 545 (6th Cir. 1986)**; *Kinsella v. Schweiker*, **708 F.2d 1058, 1059 (6th Cir. 1983)**.

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. See *Garner*, **745 F.2d at 387**.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. See *Walker v. Secretary of Health & Human Servs.*, **884 F.2d 241, 245 (6th Cir. 1989)**.

## V. ANALYSIS

Plaintiff argues that the ALJ erred by failing to find that Plaintiff's condition meets Section 12.05(C) of Appendix One to the Social Security regulations ("Listing 12.05C"). Listing 12.05C establishes the framework for determining whether a plaintiff is eligible for disability benefits where the plaintiff's claim is based, at least in part, on mental retardation.

> Listing 12.05C provides:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 . . .
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;

**20 C.F.R. pt. 404**, subpt. P, app. 1, § 12.05.

The regulations explain that a claimant meets the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* one of the four sets of criteria . . . ." *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001) (citations omitted) (emphasis in original). The standard a claimant must meet in order to establish a disability due to "mental retardation" under Listing 12.05C is therefore three-fold. Specifically, a claimant must demonstrate that he or she has: (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;" (2) "[a] valid verbal, performance or full scale IQ of 60 through 70," and (3) "a physical

9

or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

Plaintiff argues that she meets all of the criteria required to meet Listing 12.05C. First, Plaintiff argues that her IQ scores, as evidenced by two independent medical examinations and the records from Plaintiff's high school, satisfy the requirement that a claimant have IQ scores falling in the range of 60 through 70. (Doc. 12, at 10-11). Second, Plaintiff argues that she satisfies the requirement under the Listing that she demonstrate an additional and significant work-related limitation of function. (Id. at 12). As the ALJ found, Plaintiff suffers from degenerative joint disease of the left knee with patella subluxation and major depressive disorder, both of which are severe impairments satisfying the requirement under 12.05C of an additional and significant work-related limitation of function. (Id.). Third, Plaintiff argues that she has the requisite deficits in adaptive functioning to meet the Listing, as reflected in her school records — which show that Plaintiff was in special education classes and that she had deficits in communication, daily living skills, and socialization — and Plaintiff's own testimony, which indicates that she experiences difficulty doing a wide variety of daily living and work activities. (Id.).

Defendant argues in response that substantial evidence supports the ALJ's determination that Plaintiff's condition does not meet or equal listing 12.05C. According to Defendant, the totality of the evidence does not demonstrate that Plaintiff has the deficits in adaptive functioning of someone who is mentally retarded. (Doc. 13, at 8). Defendant further claims that Plaintiff fails to acknowledge that the ALJ gave good reasons for questioning the validity of Plaintiff's IQ scores. (Id. at 9). Specifically, the ALJ pointed to Dr. Smith's estimation that

Plaintiff's scores would be within the borderline range if the interference from Plaintiff's oppositional behavior could be eliminated and Dr. Schaetzle's statements that Plaintiff was capable of following multi-step commands and that Plaintiff's "understanding and memory appear[ed] to be within normal limits." (Id. at 9-10).

"The Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record." *Baker v. Commissioner of Social Security*, 21 Fed.Appx. 313, 315 (6th Cir. 2001) (citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)). In evaluating the validity of a claimant's I.Q. scores, "[i]nformation from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress)." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00 D. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West*, 240 Fed. Appx. at 698 (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993).

The ALJ in this case discarded the diagnoses of mental retardation given by Drs. Comley and Smith, citing several reasons for her decision. First, the ALJ noted the examiners' observation that Plaintiff was defensive, irritable, flippant, arrogant, and impatient, "all of which could directly affect her scores" (Tr. 19). Second, the ALJ noted that the doctors' opinions regarding the validity of Plaintiff's scores were at odds with one another. While Dr. Comley felt that Plaintiff's IQ scores were "a good measure of best current functioning and a satisfactory estimate of capacity . . . [with] no evidence of a notable interference or inefficiency which might suggest a higher potential," Dr. Smith felt that:

> the test results are considered somewhat low as a measure of best current functioning because of interference from nonintellective factors . . . [Plaintiff's] oppositional behavior is thought to have interfered with her performance and resulted in somewhat lower scores. If the interference could be eliminated, it is estimated that [Plaintiff] would be capable of functioning within the borderline range

(Id.).

The ALJ also determined that Plaintiff's "scores are lower than her adaptive functioning would suggest" (Id.). In support of this conclusion, the ALJ cited the purported fact that Plaintiff was able to complete her applications for disability benefits, that Plaintiff was able to follow multi-step commands at the consultative examination, observations on the part of a claims representative and Dr. Schaetzle that Plaintiff's understanding seemed to be within normal limits, and an apparent inconsistency in Plaintiff's testimony regarding her ability to shop for groceries (Id.). The ALJ further noted in support of her determination several other "inconsistencies" described later in the record (Id.). These included the discrepancy between Plaintiff's testimony that prior to giving up alcohol Plaintiff would drink 3-4 cans of beer per day and her report to a mental health center that she could drink a "6 pk plus others on top of it," as well as the discrepancy between Plaintiff's initial testimony at the hearing that she had never used any illegal drugs and her testimony upon further questioning that she had experimented with marijuana in high school (Tr. 21). The ALJ also made the following observations:

> [Plaintiff]'s symptoms also have not precluded her from performing routine, daily activities. As described above, she is able to perform household chores such as vacuuming, washing the dishes, and preparing meals. She also visits friends and her mother and plays board games and cards with her husband. The amount of activities in which [Plaintiff] is able to engage is not indicative of someone with debilitating symptoms. Nor are her activities indicative of someone with mild mental retardation. . . . The record is more consistent with someone with borderline intelligence

(Tr. 21-22).

In *Brown v. Sec. of Health and Hum. Servs.*, 948 F.2d 268 (6th Cir. 1991), the plaintiff challenged the district court's finding that his full scale IQ score of 68 was invalid and therefore did not satisfy the requirements of Listing 12.05C.  The Commissioner claimed that the plaintiff's functional abilities were inconsistent with an IQ score of 68, pointing to the following as evidence of that conclusion: the plaintiff was able to use public transit and had a driver's license; could clean his room and do laundry; was able to make change at the grocery store; completed the sixth grade and had a limited level of reading comprehension; visited friends; and as a truck driver, recorded mileage, the hours he worked and the places he drove. *Id.* at 269-270. However, the Sixth Circuit did not "deem these facts to be inconsistent with a valid test I.Q. of 68" and concluded that Plaintiff's IQ score of 68 in fact was valid.

In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), by contrast, the Sixth Circuit held that there was substantial evidence to support the ALJ's determination that the plaintiff did not have the requisite deficits in adaptive functioning to meet Listing 12.05C. The Court reasoned that the claimant's prior work as an accounting clerk at a bank and a liquor store demonstrated that she had the ability to perform relatively complicated tasks, and it noted that none of the plaintiff's evidence indicated that she had shown "significant subaverage general intellectual functioning with deficits in adaptive functioning" prior to age 22.  *Id.* at 355. In *Baker v. Comm'r of Soc. Sec.*, 21 Fed. Appx. 313, 2001 WL 1299255 at *2 (6 th Cir. Aug. 10, 2001), the Sixth Circuit similarly found, with little discussion, that the ALJ properly rejected the claimant's IQ scores "as underestimating his true intellectual abilities."  The Court noted that not only is the Commissioner not required to accept a claimant's IQ scores, "the ALJ should examine test

results of this sort to assure consistency with daily activities and behavior." *Id.* Substantial evidence must support the ALJ's decision to disregard a claimant's IQ scores. *Id.*

Although the ALJ in this case did not specifically state that she was rejecting Plaintiff's IQ scores of 70 and below, she implicitly did so by stating that Plaintiff's level of functioning was more consistent with someone with borderline intellectual functioning than with someone with mild mental retardation and by directly questioning the validity of Plaintiff's IQ scores. The Magistrate Judge finds that substantial evidence supports the ALJ's finding. First, much of Plaintiff's evidence regarding her level of functioning comes from her own testimony at the hearing, and the ALJ was entitled to discount Plaintiff's credibility to a certain extent based on the inconsistencies in her testimony and failure to tell the truth initially regarding her use of marijuana in high school. When there are discrepancies between what a claimant has said and what the written record shows, a reviewing court should not substitute its credibility findings for those of the ALJ. *See Hare v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 773, 775 (6th Cir. 2002) (citing *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Bradley v. Secretary of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

Second, as the ALJ noted, although two examining physicians, Drs. Smith and Comley, diagnosed Plaintiff with mild mental retardation, one of these physicians, Dr. Smith, opined that she considered the test results "somewhat low as a measure of best current functioning" and estimated that Plaintiff's scores would be higher if her "oppositional behavior" could be

eliminated.  The fact that one of Plaintiff's examiners questioned, at least to a certain extent, the reliability of Plaintiff's IQ scores gave the ALJ good reason to question those scores as well.  *Cf. Williamson v. Secretary of Health and Human Servs.*, 796 F.2d 146, 150, 151 (6th Cir. 1986) (the rejection of a claimant's IQ score of 67 was proper where the IQ examiner commented that the claimant's score did not reflect his real status because claimant did not put forth a good effort on the tests).

Third, as the ALJ pointed out, Plaintiff is able to engage in a number of activities of daily living despite her impairments (Tr. 21).  Plaintiff can perform household chores, visit friends and family, prepare meals and play games with her husband (Id.).  Plaintiff also was able to follow multi-step commands at a consultative examination (Id.). Such activities, while perhaps insufficient on their own to establish that Plaintiff's level of adaptive functioning necessarily is inconsistent with mild mental retardation — *see Brown*, 948 F.2d 268 — lend significant support to the ALJ's determination that Plaintiff does not meet Listing 12.05, especially when viewed in combination with the other factors listed above.  The Magistrate Judge also notes as supportive of the ALJ's determination (although the ALJ did not specifically use it) the assessment of state agency psychologist, Jason Haakins, Psy.D., that Plaintiff has *borderline* intellectual functioning, as opposed to mild mental retardation (Tr. 222-37).  See *Walker*, 884 F.2d at 245 (stating that the reviewing court may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision).  Dr. Haakins also determined that Plaintiff is only moderately limited in understanding and remembering very short and simple instructions, carrying out such instructions, and working in coordination with or near others.

As explained earlier, the Court's job is to determine whether the decision of the ALJ is supported by substantial evidence. Substantial evidence is that which a reasonable mind might accept as adequate support for the Commissioner's determination. *See* **Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981)**. The Magistrate Judge finds, based on the above, that substantial evidence supports the ALJ's determination that Plaintiff does not meet Listing 12.05C.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is supported by substantial evidence. Accordingly, the Court recommends the decision of the Commissioner be AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: June 2, 2009.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See* **Thomas v. Arn, 474 U.S. 140 (1985)**; *see also* **United States v. Walters, 638 F.2d 947 (6th Cir. 1981)**.