UNITED STATES DISTRICT COURT
NORGTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                        :
MISTY D. HAYES,                                         :
                                                        :        CASE NO. 1:08-cv-2056
        Plaintiff,                                      :
                                                        :
vs.                                                     :        OPINION & ORDER
                                                        :        [Resolving Doc. No. 15]
COMMISSIONER OF SOCIAL                                  :
SECURITY,                                               :
                                                        :
        Defendant.                                      :
                                                        :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Misty Henderson-Hayes filed this Complaint against Defendant Commissioner of Social Security alleging that the Social Security Administration ("SSA") improperly denied her application for Supplement Security Income and Disability Insurance Benefits. [Doc. 1-1 at 1.] The parties submitted their briefs on the issue, [Docs. 12, 13,] and the Magistrate Judge recommended that this court affirm the Commissioner's decision to deny benefits. [Doc. 14.]

Plaintiff Henderson-Hayes sought benefits saying that she met Listing 12.05(C) of Appendix One to the Social Security regulations ("Listing 12.05(C)"), 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.05(C). [Doc. 14 at 9.] To qualify under Listing 12.05(C), the claimant must demonstrate the required level of severity of mental retardation. The administrative law judge ("ALJ") found that, despite several I.Q. scores within the required range, Henderson-Hayes did not meet the mental-retardation requirement of Listing 12.05(C). Henderson-Hayes has objected to the Magistrate

-1-

Case No. 1:08-cv-2056
Gwin, J.

Judge's recommending that this court affirm the ALJ on this issue. [Doc. 15.]

In resolving this motion, this Court must decide whether substantial evidence supports the ALJ's decision. Because the ALJ did not adequately explain her decision denying benefits, this Court **REMANDS** for further consideration.

## I.  Background Procedure

On November 6, 2003, Plaintiff filed her application for benefits alleging that she had been disabled since childbirth because of a learning disability and a bad knee. [R. 67-70, 176-79.] The SSA denied the claim initially and on reconsideration. [R. 38-39, 181, 187, 197.] The ALJ then denied benefits on March 21, 2007.  Henderson-Hayes sought review, but the Appeals Council found no basis. [R. 5-9, 315.] She now seeks review of the ALJ's decision under 42 U.S.C. § 405(g).

## II.  Standard of Review

When a district court refers a matter to a magistrate judge, the district court is only required to conduct *de novo* review of those parts of the report and recommendation to which a party objects. 28 U.S.C. § 636.  Because the Plaintiff objected, this Court must conduct its own review of the Commissioner's decision.  This review is "limited in scope to . . . whether the findings of fact made by the [Commissioner] are supported by substantial evidence and . . . whether the [Commissioner] employed the proper legal criteria in reaching her conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984).  This Court cannot "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.* at 388 (citations and internal quotations omitted).  "[S]o long as substantial evidence supports the conclusion," this Court cannot reverse the ALJ "even if there is substantial evidence in the record that would have supported the opposite conclusion." *Key v. Callaham*, 109 F.3d 270, 273 (6th Cir. 1997).

Case No. 1:08-cv-2056
Gwin, J.

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and internal quotations omitted).

The Sixth Circuit has read Listing 12.05(C) as a three part test. To meet Listing 12.05(C), a claimant must demonstrate that she has: (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;" (2) "[a] valid verbal, performance or full scale IQ of 60 through 70," and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See Foster*, 279 F.3d at 354. The ALJ found, and the Commissioner does not dispute, that Henderson-Hayes met part three of this test.

Below, this Court will describe the proceeding before the ALJ, focusing on the evidence related to the I.Q. scores and the diagnosis of mental retardation or deficits in adaptive functioning.

### III. Evidence in the Record

*III.A.   Evidence on Mental Retardation from Medical Sources and Test Scores*

On March 3, 2000, while still in high school, Henderson-Hayes had an I.Q. test where she scored verbal 79, performance 67, full scale 71. [R. 148.] The high school records also indicate that she was in special education classes for the majority of her schooling. [R. 141-66.]

In December 2003, state agency psychologist Jason Haakins, Psy.D., completed a Psychiatric Review Technique form and "Mental Residual Functional Capacity Assessment" ("mental RFC assessment"). [R. 222-37.] He noted borderline intellectual functioning, and assessed that Henderson-Hayes (1) was not significantly limited in most areas; (2) was moderately limited in understanding and remembering very short and simple instructions, carrying out such instructions,

Case No. 1:08-cv-2056
Gwin, J.

and working in coordination with or near others without being distracted; and (3) was markedly limited in understanding and remembering detailed instructions, and carrying out such instructions. [R. 235.]

On April 19, 2004, during a physical examination, Dr. Paul T. Scheatzle, D.O., noted that Henderson-Hayes "was able to follow multi-step commands and gave good effort," and that "her understanding and memory appear[ed] to be within normal limits." [R. 251.] But, he also noted that "[i]t took her a great deal of time to complete her initial consultation form and she is somewhat of a poor historian." [R. 251.] Dr. Scheatzle, however, noted that his evaluation was not a "formal[] evaluat[ion]" of Henderson-Hayes's mental functioning. [R. 251.]

On April 12, 2004, at the request of the Department of Job and Family Services, Henderson-Hayes underwent a psychological evaluation by Laurel Smith, Psy.D. [R. 245-49.] Dr. Smith found that Henderson-Hayes had "significantly subaverage intellectual functioning, with a measure IQ of 70 . . . , which places her within the Mild Mental Retardation range." [R. 248.] Dr. Smith concluded that she "should be considered 'psychologically disabled.'" [R. 248.] Continuing, Dr. Smith suggested that Henderson-Hayes "would benefit from someone helping with her finances and medical treatments." [R. 248.]

Importantly, however, Dr. Smith also noted that Henderson-Hayes was "defensive, [] irritable[], . . . defensive, guarded, argumentative and impatient." [R. 246.] Dr. Smith concluded that

> the test results are considered low as a measure of best current functioning because of inference from nonintellectual factors. . . . [Henderson-Hayes's] oppositional behavior is thought to have interfered with her performance and resulted in somewhat lower scores. If the interference could be eliminated, it is estimated that [Henderson-Hayes would be capable of functioning within the borderline range.

[R. 19, 246-47.]

Case No. 1:08-cv-2056
Gwin, J.

Around one and a half years later, on December 1, 2005, Henderson-Hayes went to John A. Comley, Psy.D. for another psychological evaluation. [R. 308.] Dr. Comely conducted a mental status exam, and noted that "[m]uch of the time during the period the patient cooperated well and was alert and attentive, but she also frequently appeared selfconscious, passive, dependent, withdrawn, apathetic, subdued, and blunted in her affect." [R. 308-14.] Dr. Comley assessed Henderson-Hayes's full scale I.Q. at 70, verbal I.Q. of 76, and performance I.Q. of 69. [R. 310.] Dr. Comley noted that "[t]here was no evidence of notable inference or inefficiency which might suggest a higher potential, and [Henderson-Hayes] is thought to be functioning at a level approaching her capacity." [R. 310.]

In addition, Dr. Comley assessed Henderson-Hayes' global assessment of functioning at 49, and opined, like Dr. Smith, that "[w]ith regard to her work situation, [she] should be considered 'psychologically disabled'" [R. 311.] Dr. Comley also completed a mental RFC assessment for Henderson-Hayes, and in twenty different areas of functioning he assessed that she was not significantly limited in one area; moderately limited in seven areas; markedly limited in four areas; and extremely limited in eight areas, including the ability to complete a work day or week without interruptions, to get along with coworkers, and to maintain socially appropriate behavior. [R. 313.]

Listing 12.05(C) requires at least one I.Q. score between the range of 60 - 70. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.05(C). The regulations provide that, "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ are provided, . . . the lowest of these [will be] used in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00 D(6)(c). The record shows scores within the impaired in-range score from each of the three times that Plaintiff has undergone I.Q. testing.

Case No. 1:08-cv-2056
Gwin, J.

But I.Q. scores "must reflect the plaintiff's true abilities as demonstrated by his or her performance at work, household management and social functioning." *Brown v. Secretary of Health and Human Services*, 948 F.2d 268, 269 (6th Cir. 1991) (citations omitted). Accordingly, below, this Court will summarize the additional functional-abilities evidence in the record.

*III.B.    Other Functional-Abilities Evidence in the Record*

Henderson-Hayes testified that she attended a friend's wedding the year before the hearing, and that she visited her mom every month, who lived about thirty to forty-five minutes from her. [R. 326.] She also explained that she did not have a bank account, and, although she used to have one, she had trouble keeping it balanced, and would sometimes bounce checks. [R. 328.] In addition, Henderson-Hayes testified that she did not do her own grocery shopping because she was unsure how to calculate totals and thought that she would spend more money than she had. [R. 333.]

She also stated that she had problems socializing because she did not "like being around a lot of people," although, everyday she would visit friends in the neighborhood. [R. 334.] Also, she watched television with her husband, and played board and card games with him. [R. 340.] In 2003, she lived in the same house with five other people (her aunt and uncle's house), and said it "went pretty good." [R. 341.]

Henderson-Hayes was able to complete on her own an agency "Disability Report Adult" form, consisting of ten pages of questions about her claim for disability. [R. 82-91.] In March 2004, she completed a seven-page "Disability Report-Appeal" form herself. [R. 107-113.] In November 2004, Henderson-Hayes completed a four-page "Symptoms Report" form herself. [R. 121-24.]

**IV.  Analysis**

In Appendix 1 to Subpart P of 20 C.R.F. Part 404, the SSA provides the requirements that

Case No. 1:08-cv-2056
Gwin, J.

Henderson-Hayes must meet in order to qualify for benefits. Listing12.05(C) in this Appendix states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

A claimant's demonstrating that she meets the requirements in C is not enough to satisfy the listing: "[a]s the Commissioner has pointed out, recent amendments to the regulations further clarify that a claimant will meet the listing for mental retardation only [i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria . . . ." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations and internal quotations omitted).

As noted above, the Sixth Circuit has read Listing 12.05(C) as a three part test. To meet Listing 12.05(C), a claimant must demonstrate that she has: (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;" (2) "[a] valid verbal, performance or full scale IQ of 60 through 70," and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." See *Foster*, 279 F.3d at 354. The ALJ found, and the Commissioner does

-7-

Case No. 1:08-cv-2056
Gwin, J.

not dispute, that Henderson-Hayes met part three of this test.

Before determining whether substantial evidence supports the ALJ's conclusion that Henderson-Hayes did not meet the requirements of Listing 12.05(C), this Court will describe the ALJ's decision.

*IV.A.    The ALJ's Decision*

The Magistrate Judge noted that, "the ALJ in this case did not specifically state that she was rejecting Plaintiff's IQ scores of 70 and below." [Doc. 14 at 14.] But the Magistrate Judge found that the ALJ "implicitly [rejected Plaintiff's I.Q. scores] by stating that Plaintiff's level of functioning was more consistent with someone with borderline intellectual functioning than with someone with mild mental retardation and by directly questioning the validity of Plaintiff's IQ scores." [Doc. 14 at 14.]

The ALJ found that the "totality of the evidence . . . d[id] not support a diagnosis of mental retardation or deficits in adaptive functioning. [R. 19.] This language tracks the language of the introductory paragraph of Listing 12.05(C) and does not at all reference the validity of the I.Q. tests. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C) (noting, in the introductory paragraph, that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period").

It appears that the ALJ found that Henderson-Hayes did not meet the diagnostic description of § 12.05(C) but did not find invalid the I.Q. scores of 70 and below. But the ALJ does not make this clear. Below, this Court will analyze whether substantial evidence supports this decision.

*IV.B.    Finding that a Claimant Does Not Meet Listing 12.05(C) Despite In-Range I.Q. Score*

To be valid, "an IQ score must reflect the plaintiff's true abilities as demonstrated by his or

-8-

Case No. 1:08-cv-2056
Gwin, J.

her performance at work, household management and social functioning." *Brown*, 948 F.2d at 269 (citations omitted); *see also* Baker v. Commissioner of Social Security, 21 Fed. Appx. 313, 315 (6th Cir. 2001) (unpublished) (noting that an ALJ can reject I.Q. scores if they do not reflect a claimant's true abilities and that "the ALJ should examine test results of this sort to assure consistency with daily activities and behavior"). "In assessing the validity of a claimant's IQ, [i]nformation from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistance [sic] and pace; or ability to tolerate increased mental demands (stress)." *Brown*, 948 F.2d at 269 (citations and internal quotations omitted).

In *Brown*, the Sixth Circuit reviewed an ALJ's decision to reject a claimant's I.Q. scores. *Id.* In saying that the Sixth Circuit should affirm the ALJ's decision, the Secretary noted the various activities that the claimant was able to perform:

> [The claimant] is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension ([the claimant] stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, [the claimant] recorded mileage, the hours he worked, and the places he drove.

*Id.* at 270.

The court, however, noted that this functional-abilities evidence "fit squarely within the [*Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1897) ("DSM-III-R")] profile of a mildly retarded individual." *Id.* In rejecting this functional-abilities evidence, the court held: "We do not deem these facts to be inconsistent with a valid test I.Q. of 68, and the Secretary offers no empirical evidence in support of this conclusion." *Id.*

Case No. 1:08-cv-2056
Gwin, J.

In a later case addressing the validity of in-range low I.Q. scores, *Cooper v. Commissioner of Social Security*, 217 Fed. Appx. 450, 452 (6th Cir. 2007) (unpublished), the Sixth Circuit noted that a claimant "performed a number of common activities inconsistent with mental retardation, including semiskilled work for a number of years, playing guitar, and riding a motorcycle." In *Cooper*, however, "no psychologist had diagnosed [the claimant] with mental retardation." *Id.* at 452. Additionally, although only a single I.Q. score between 60 and 70 is necessary to satisfy the test score requirement, *see Brown*, 948 F.2d at 270 ("The regulations regulations require only that the lowest I.Q. score be used in conjunction with Listing 12.05 C."), in *Cooper*, the claimant had only offered evidence of a single test where he scored 77 verbal, 70 performance, and 72 full.

Here, in denying benefits, the ALJ found it important that Dr. Smith reported that Henderson-Hayes's I.Q. scores were lower than her functional ability suggested and that, "[i]f the interference could be eliminated, it is estimated that [she] would be capable of functioning within the borderline range." [R. 19.] The ALJ, however, does not explain why this finding by Dr. Smith should apply to Henderson-Hayes's earlier test in high school where she scored an in-range low score. [R. 148.] Additionally, the ALJ did not explain why this finding would apply to the test with Dr. Comely, conducted after Dr. Smith's assessment, where Henderson-Hayes again received an in-range low score and Dr. Comely expressly noted that the scores accurately reflected Henderson-Hayes's functional abilities. [R. 310.]

In the high school test that occurred before Dr. Smith's questioning, and the test with Dr. Comely that occurred after Dr. Smith's questioning, Henderson-Hayes tested in a range that satisfied the I.Q. score requirement of Section 12.05(C). Aside from Dr. Smith, no doctor administering a

-10-

Case No. 1:08-cv-2056
Gwin, J.

test questioned whether her scores were consistent with her functional abilities.[1] The single statement by Dr. Smith questioning the accuracy of Henderson-Hayes's I.Q. score does not, on its own, constitute substantial evidence for finding that Henderson-Hayes did not meet Listing 12.05(C).

But the ALJ also examined other evidence in the record related to Henderson-Hayes's functional abilities.  The ALJ noted that Henderson-Hayes's was able to perform routine, daily activities, such as vacuuming, washing dishes, preparing meals, listening to music, watching television, and occasionally mowing the lawn. [R. 17, 21.] In addition, the ALJ observed that Henderson-Hayes visited friends daily and her mother monthly, and played board games and cards with her husband. [R. 21.] Also, the ALJ noted that Henderson-Hayes was able to follow multi-step instructions during state agency examinations, and complete Agency forms for her claims.[2] [R. 18, 21, referencing Tr. 82-91, 10713, 121-24, 251-52.]

The ALJ, however, did not make clear how this additional evidence of functional abilities is different than the evidence that the court rejected in *Brown*.  The additional evidence in *Brown*

---

[1] The ALJ wrote that "both examiners state that the claimant was defensive, irritable, flippant, arrogant, and impatient, all of which could directly affect her scores." [R. 19.] This language, however, only accurately reflects Dr. Smith's report. [R. 245-249.] Dr. Comley, who conducted his examination after Dr. Smith, described Henderson-Hayes much more favorably:

> At the beginning of the assessment session she complied with examiner requests and was particularly courteous toward the examiner, but she also was rather cautious and depressed. . . . Much of the time during the period the patient cooperated well and was alert and attentive, but she also frequently appeared selfconscious, passive, dependent, withdrawn, apathetic, subdued, and blunted in her affect.

[R. 309.]

[2] Henderson-Hayes disputes that she was able to fill out these forms on her own saying that "the record clearly reflects at least three styles of handwriting on these forms, suggesting most likely that Plaintiff did not author them herself entirely, if at all, and had extensive assistance in their completion." [Doc. 15 at 3-4.] The Commissioner responds that "[i]t is unclear which form she is referencing because she did not provide a record citation [and] [e]ven so, it does not change the fact that with respect to at least three forms, . . . Henderson-Hayes indicated that she completed them herself." [Doc. 16 at 8.]

Case No. 1:08-cv-2056
Gwin, J.

demonstrated that the claimant's "social and vocation skills [were] adequate for minimum self-support," *cf.* Brown, 948 F.2d at 270 (quoting DSM-III-R § 317.00) (emphasis removed), and the Sixth Circuit held that this evidence did not constitute substantial evidence supporting the Commissioner's decision denying benefits. *Id.* at 271.

The ALJ did not make clear how this functional-abilities evidence was inconsistent with Henderson-Hayes's in-range low I.Q. scores. Accordingly, the combination of Dr. Smith's questioning of a single I.Q. test and the additional functional-abilities evidence does not rise to the level of substantial evidence to support the ALJ's decision denying benefits.

## V. Conclusion

Because the ALJ has not sufficiently explained why the evidence on Henderson-Hayes functional abilities is inconsistent with her in-range I.Q. scores, and because the single statement by Dr. Smith questioning the validity of the test that she performed does not on its own constitute substantial evidence, this Court **REMANDS** this matter back to the Commissioner for further review and expansion of the record if necessary. The Commissioner should explain (1) whether Henderson-Hayes's in-range I.Q. scores were invalid; and (2) why the functional-abilities evidence on the record is inconsistent with Henderson-Hayes's in-range I.Q. scores. *see Brown*, 948F.2d at 270.

IT IS SO ORDERED.

Dated: August 6, 2009                         s/         *James S. Gwin*
                                              JAMES S. GWIN
                                              UNITED STATES DISTRICT JUDGE